Filed 2/26/14  In re Nathan Z. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re NATHAN Z., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NATHAN Z.,<br><br>        Defendant and Appellant. | A137314 & A138745<br><br>(Sonoma County<br>Super. Ct. No. 36744J) |

After two years, nine Welfare and Institutions Code section 602 petitions,[1] and countless probation violations, the juvenile court ordered 17-year-old Nathan Z. continued in placement with an out-of-state placement option, resulting in his placement at Rite of Passage Silver State Academy (Rite of Passage or ROP) in Nevada.  Nathan appeals from the disposition order, asserting that the out-of-state placement option was an abuse of the juvenile court's discretion.  He also contends that the court's imposition of a probation condition requiring him to take all medication as prescribed was error.  (*In re Nathan Z.*, no. A137314 (*Nathan Z. II*).)

---

[1] All statutory references are to the Welfare and Institutions Code except where otherwise stated.

1

Within three months of his out-of-state placement—and while the appeal in *Nathan Z. II* was pending before us—Nathan was discharged from Rite of Passage and found in violation of his probation. At disposition, the juvenile court ordered him detained in juvenile hall for 868 to 1,855 days, with credit for 434 days served (for 434 to 1421 days of actual confinement).[2] Nathan also appeals from that disposition order, contending the juvenile court abused its discretion in imposing such a lengthy juvenile hall commitment, and also asserting that the order was erroneous on multiple other grounds. (*In re Nathan Z.*, no. A138745 (*Nathan Z. III*).) We ordered the appeals consolidated.

We reject Nathan's challenges to his out-of-state placement and juvenile hall commitment, concluding there was no error. We agree, however, that the probation condition requiring him to take all medication as prescribed was improper, both facially and as applied. We therefore order that term stricken. We affirm in all other regards.

**BACKGROUND**

Nathan's frequent involvement with the juvenile justice system since he incurred his first sustained section 602 petition at age 14 is well known to this court, as we previously considered—and denied—a prior appeal challenging an earlier juvenile hall commitment. (*In re Nathan Z.* (July 24, 2013, A135530) [nonpub. opn.] (*Nathan Z. I*).) Nevertheless, we describe his background in significant detail because a complete picture of Nathan's behavior is relevant to the issues before us.[3]

**Original Section 602 Petition**

Nathan's behavioral problems began when he was a young child, escalating when he was 10 years old and spiraling further downward by the time he was 12. In an attempt to stop the downward spiral, Nathan's mother sent him to a series of private, out-of-state

---

[2] With the credit for 434 days, the court calculated the actual range to be 434 to 1,398. It is unclear how the court arrived at 1,398 days as the maximum time of confinement, since 1,855 minus 434 equals 1421.

[3] We derive this background from the records in the two appeals before us, as well as the record in *Nathan Z. I*, of which we have taken judicial notice at Nathan's request.

2

placements. After two years, she ran out of funds for the private placements, so when Nathan was 14 years old, he returned home. According to Nathan, he was traumatized by being sent away from home, and he was very angry and resentful towards his mother.

In October 2010, shortly after Nathan's return home, he was arrested for possession of marijuana at school. The matter was referred to juvenile probation, but it was not prosecuted.

The following month, Nathan got into an argument with his mother, during which he pushed her, causing her to hit her head on a wall. Nathan fled and remained missing for several days. He was located four days later but fled when approached by police officers. He was eventually apprehended and booked into juvenile hall.

On November 22, the Sonoma County District Attorney filed an original section 602 petition, alleging that Nathan committed battery on his mother and resisted a peace officer. He admitted the second count in exchange for dismissal of the first, and was placed on formal home probation with various terms and conditions. One such condition was that he complete the Assertive Community Treatment (ACT) program.

On February 8, 2011, the probation department filed a section 777 notice of probation violation alleging that Nathan had tested positive for marijuana.

**Second Petition**

On February 14, Nathan was arrested for "tagging" a utility box with graffiti. The district attorney filed a second section 602 petition, alleging that Nathan vandalized public property, possessed paint markers with the intent to commit graffiti, and possessed marijuana. He admitted committing vandalism and violating probation in exchange for dismissal of the remaining two counts, and the court reinstated probation.

On February 23, Nathan left his mother's home without permission and his whereabouts were unknown. The probation department filed a section 777 notice of probation violation, and the court issued a warrant for his arrest and revoked his probation.

**Third Petition**

Nathan's whereabouts remained unknown until April 13, when he was spotted in a convenience store parking lot. He ran from two police officers, striking one officer in the face when he was apprehended. He was ultimately detained and arrested. An April 14 section 602 petition alleged that he had resisted arrest and committed battery on a police officer.

**Fourth Petition**

Meanwhile, an ongoing investigation linked Nathan to 18 separate acts of vandalism, and on April 15, a fourth section 602 petition was filed, charging him with felony vandalism, with two additional counts of vandalism added later.

Nathan admitted one count of graffiti vandalism and one count of resisting arrest. The remaining counts from the April 14 and 15 petitions, as well as the section 777 petition, were dismissed.

At a disposition hearing on May 5, the juvenile court declared Nathan a ward of the court and reinstated him on probation.

On June 29, the probation department filed a section 777 notice of probation violation after Nathan's mother reported that he had been out past curfew for 15 straight days, and on one occasion remained away from home all night without permission. Nathan also failed to remove a lock from his bedroom door as directed by his probation officer, and he failed to follow through with a court referral to the Drug Abuse Alternatives Center (DAAC). Nathan admitted the violations, and the court reinstated probation.

On July 14, Nathan was released to his mother's custody with permission to live with his grandparents, and ordered to remain on the ACT program.

**Fifth Petition**

On July 26, Nathan fled from a Santa Rosa police officer who was responding to a report of a fight in progress at a local middle school. When the officer caught up with Nathan, he tackled Nathan from behind and gave him a "distraction blow" to the back of the head. When Nathan failed to respond to the officer's commands to show his hands,

4

the officer realized that Nathan, who was snoring loudly and smelled like alcohol, had passed out.

On August 17, the district attorney filed another section 602 petition, alleging that Nathan had resisted arrest while under the influence of alcohol. The following day, the probation department filed a section 777 notice of probation violation based on the same incident. On September 1, Nathan admitted resisting arrest, and the under-the-influence allegation and probation violation were dismissed.

**Sixth Petition**

On September 27, the Santa Rosa Police Department received a report of a possible burglary. When an officer responded, he discovered Nathan loitering in the area. A search uncovered a "hardcover waterproof pigment ink pen," leading to Nathan's arrest.

A sixth section 602 petition charged Nathan with possession of a marking pen with intent to commit vandalism and possession of cigarettes. A section 777 notice of probation violation alleged the same charges.

The probation department interviewed Nathan on October 4. Nathan advised that he wanted to complete the remainder of his probation time in juvenile hall. As stated in the probation report, "Dispositional options were discussed with [Nathan], and Nathan was adamant that he would not comply with a suitable placement. He indicated that there was 'no way' he would cooperate, and stated if he was ordered to a suitable placement, he would simply run. He knows he would get arrested and be returned to Juvenile Hall, and then he would be ordered to serve time and dismiss, 'which is what [his] ultimate goal was anyway.' "

On October 17, Nathan admitted the probation violation, and the court dismissed the sixth petition. He was returned to the home of his mother with permission to continue living with his grandparents. The court also imposed 60 to 90 days in juvenile hall, followed by 30 to 60 days of community detention, with the caveat that if Nathan obtained level three status at juvenile hall, he could seek release on community detention.

On January 3, 2012, Nathan's probation officer searched his bedroom and found seven plastic bags of marijuana, a glass marijuana pipe, two bottles of vodka, four lighters, and 17 marking pens. The next day, Nathan was discharged from the DAAC program for poor attendance, behavioral issues, defacing program property, and refusing to submit to a chemical test. A section 777 notice of probation violation followed.

At a January 10 hearing, Nathan admitted the probation violations. The court ordered him detained at juvenile hall and continued the matter to January 19 for an oral report.

At the January 19 hearing, Nathan's probation officer advised the court that all parties involved were "at the end of their ropes" with him but that, in combination with the ACT staff and his mother and grandparents, they were able to come up with a reasonable plan for him. The probation officer asked for 60 additional days to work with Nathan.

The court agreed to give Nathan one last opportunity to perform in the ACT program, and Nathan was released from juvenile hall to the care of his mother, grandparents, or probation officer to begin community detention for 60 to 90 days.

Despite having been given one more chance, Nathan failed at community detention when he removed his ankle monitoring device and absconded following suspension from school. In support of the resulting section 777 notice of probation violation, Nathan's probation officer represented that on February 27, Nathan left school without permission and did not return home, and his whereabouts remained unknown. A warrant was issued for Nathan's arrest.

**Seventh Petition**

On March 2, a probation officer who knew Nathan had an outstanding arrest warrant spotted him walking in town and contacted a passing police officer for assistance. The officers attempted to make contact with Nathan but instead of responding to them, he ran from the area. The police officer gave chase, eventually tackling Nathan in order to restrain him in handcuffs. He was placed under arrest and booked into juvenile hall.

6

On March 5, the district attorney filed a section 602 petition alleging one count of resisting arrest. Nathan admitted the charge, and the pending probation violation was dismissed.

Nathan's matter came on for disposition on April 10. The probation officer advised the court that the probation department was recommending 26 months and 20 days in juvenile hall. Nathan's counsel conceded that he had "failed probation at home." She encouraged the court, however, to consider other options, "whether it's the camp program or something like out-of-state placement. A structured program is what this young man needs."

Nathan addressed the court, acknowledging that he had not "been the best candidate for probation" and asking for a chance at "probation camp or . . . something like that." He accepted that he deserved punishment, but pleaded with the court to give him a chance at a camp placement where he could work toward developing life skills and getting a job, rather than to "just sit" at juvenile hall "with a bunch of negative peers around me . . . ."

Nathan's grandfather also spoke at the disposition hearing. He urged the court to commit Nathan to probation camp, which he believed would provide the best opportunity for Nathan's rehabilitation. Alternatively, he asked that the court review Nathan's case every month to reconsider camp placement.

The hearing concluded with the court imposing an additional 730 to 800 days in juvenile hall, subject to the caveat that if Nathan were to achieve and maintain level three status at juvenile hall, he could schedule a request for the court to reconsider the disposition.

On May 18, 2012, Nathan appealed from the April 10 disposition order. On July 24, 2013, we affirmed the disposition, concluding the juvenile court did not abuse its discretion in ordering Nathan detained at juvenile hall. (*In re Nathan Z. I.*)

Meanwhile, on July 9, 2012, Nathan made an ex parte request to have his case placed on the court's calendar because "he has been level 3 for 3 days and has some certificates from juvenile hall." The probation department opposed Nathan's request

7

because he had incurred four incident reports in juvenile hall between April 14 and May 24, including fighting with another resident. Nevertheless, on August 24, 2012, Nathan was placed at the Aldea Redwood House group home (Aldea) in Napa.

**Eighth Petition**

A mere three weeks after he arrived at Aldea, Nathan incurred his eighth section 602 petition, this one filed in Napa County, for committing battery on a school employee and disturbing the peace, with a third count for assault on a school employee added later. At a detention hearing two days later, the court ordered Nathan detained in juvenile hall.

As described in the detention report, Nathan was involved in an altercation at school. After he was disrespectful to a teacher, the teacher directed him to eat his lunch in the "time out" room. Nathan uttered a profanity to the teacher, but when asked to repeat his statement, he refused. As Nathan exited the classroom, another student yelled something offensive at him. Nathan returned to the classroom, and the two boys yelled at each other and challenged each other to a fight. In an attempt to break up the altercation, the teacher stepped between the two boys and placed a hand on Nathan's chest to keep them apart. Nathan slapped the teacher's arm numerous times and "crowded up" on her. He ignored her demands that he stop and leave the room, instead continuing to challenge the other boy. With the assistance of additional school personnel, the two boys were eventually separated, and both were arrested.

On October 5, Nathan admitted disturbing the peace, and the remaining counts were dismissed. The case was then transferred to Sonoma County for disposition.

**Ninth Petition**

That same day, October 5, the Napa County District Attorney filed yet another section 602 petition against Nathan, this one alleging one count of felony vandalism. The court sustained the vandalism allegation and transferred the matter to Sonoma County for disposition.

In a supplemental disposition report, the probation department described the incident that lead to the vandalism charge. According to the report, on September 29,

8

Nathan had to be physically restrained by juvenile hall staff for behavioral problems. He was returned to his room with nothing but the clothes he was wearing. While in his room, Nathan swung his clothing, catching the fire sprinkler system that extended from the ceiling. The sprinkler broke, flooding the room with chemically treated water and causing an estimated $3,000 in damage.

Nathan was interviewed by the probation department regarding his offenses. As to the altercation at school, Nathan related that he did not intend to hurt his teacher, just to remove her hands. He was frustrated with himself because he could have handled the situation better by ignoring the other student and going to the office instead. He expressed regret about being removed from his placement at Aldea, because he "liked it a lot."

As to the vandalism at Napa County juvenile hall, Nathan claimed he was being mistreated by the staff, who were denying him access to soap during his shower. He maintained that he was nevertheless respectful, until they "grabbed" him and "tried to slam" him to the ground. By then he was angry because he did not deserve to be treated like that. After that, all of his belongings were removed. He was bored in his room and did not know what the sprinkler valve was because it looked like a cap held in place on the wall with "flimsy metal." When the cap broke off, a sprinkler "shot out and sprayed black oil" all over the room.

In terms of "Medical/Mental Health," the probation department noted that Nathan did not report any current medical problems. Nathan advised that he was taking Seroquel[4] for sleep, and he acknowledged struggling with anger and impulse control issues. Both Nathan's mother and probation records indicated he had been diagnosed

---

[4] According to the National Institutes of Health, Seroquel is a brand name for quetiapine, an antipsychotic drug used to treat symptoms of schizorphrenia and episodes of mania or depression in patients with bipolar disorder. <http://www.nlm.gov/ medlineplus/druginfo/meds/a698019.html> [as of Feb. 26, 2014]; see generally, *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1310-1312 [discussing antipsychotic medications].)

9

with oppositional defiant disorder. Nathan's mother stated that she "hates" Seroquel and "wants him off it" because she worries "about the effects on his brain."

According to the probation department, since Nathan's return to Sonoma County Juvenile Hall in October, he had engaged in misbehavior resulting in four incident reports. In one, he and another resident continued talking through their vents despite repeated directives to stop. When he was directed to change rooms, he refused, accusing staff of being racist. Three days later, Nathan and another resident began arguing, threatened each other, and nearly got into a fight, resulting in room confinement for a day. Less than 10 days later, Nathan refused to follow staff directives when he was told to end a phone call after his allotted 15 minutes. After he was placed on room confinement for ignoring staff orders, he demanded a due process form. He continued to argue with staff, and then refused to return a pencil until he was allowed to fill out a grievance form, all the while being verbally abusive with the staff. After a full hour of counseling and argument, he still refused to return the pencil, so it was taken from him forcefully. Less than two hours later, Nathan refused to return his dinner spork. He was ultimately removed from his room in handcuffs, laughing as he was lead away and asking, "Which one of you is going to search my room for the spork?" It was subsequently located in his toilet under feces.

The report informed the court that the departmental screening committee had evaluated Nathan's case, ruling out camp due to his lack of impulse control, immaturity, and inability to comply with rules, as well as the dangers inherent in the camp environment given the presence of tools. It also rejected juvenile hall, agreeing that while it would be appropriately punitive, it would not be productive and that without treatment he was more likely to reoffend. The committee ultimately recommended that Nathan again be ordered into placement, with out-of-state orders included to expand the options available for finding a program that would fit Nathan's need for structure and treatment. It was also noted that out-of-state placement required approval of the case management council, and that Nathan's case would be presented to that council on November 21.

10

**Disposition**

A contested disposition hearing was held on November 16, 2012.  At the outset, the court advised that it was going to either follow the probation department's out-of-state placement recommendation or impose 1,460 days in juvenile hall.  After hearing argument, the court ruled as follows:

"I am going to use the out-of-state orders.  [¶] Because Nathan, frankly, you may have burned bridges at other programs and they will not take you.  So probation needs every option they have.  Because what they will do, as you know, they will send out a request to various programs they think might help you, which includes Aldea.  Because there is some indication that Aldea may take you back.  But Aldea may reconsider that, [and] say, 'No, we are not gong to take him back.'  [S]o then they have to go somewhere else.  And those programs will come and look and speak with you.

"One of the concerns I have, as I read the report—and as your mom says, you have been in front of me for a long time—is there is almost a step backward in not taking responsibility.  I would think, if I were you, I would reflect, as you go to the next placement, wherever it may be that—what I've heard over the past three years is, well, people at my school did not like me.  Well, people at the hall did not like me.  People in this unit did not like me.  People in the ACT program did not like me.  They were all out to get me.  [¶] When that happens in all of these variety of places with all of those different individuals, . . . perhaps it is time to look inward.

"Delancy Street, which is an adult program . . .  I went down there one time to take a tour.  And one of the folks who was . . . showing me around . . . he talked about folks who come in and say, 'Well I have this problem or I have that problem.  I have a drug problem.  I have an alcohol problem.'  [¶] Their reaction is to say:  No.  You have a 'you' problem.  You have to deal with you.  [¶] . . . And you have to take some steps forward.  In the three years that you have been in front of me, it has been one step forward and three steps back.  And unless you resolve that, you are going to reach a point where the Court has no alternative other than to simply lock you up.  I agree with [defense counsel].  I agree with your mother.  I agree with probation.  There is not a whole lot productive

11

that is going to come out of that. But at some point that is the only option. You have tied everyone's hands and you will have to deal with you. [¶] Because whether it is this school, that school, that placement, this placement, eventually you will have to do it. And the way you will succeed in a program is do the program. You want to get through the program fast? Do the program correctly."

Nathan responded, "I know," and the court continued:

"And that is how you will get through the program. Starting out three years ago, there were a lot of kids who came through this courtroom, and they have come and gone and they are back out in the community successfully. You are on—what—[f]ile three of three. That is not a good thing.

"So at this point I am going to order that you be retained a ward of the court. All orders the court made in the past will remain in full force and effect. . . . [¶] . . . You're also to take any prescribed medication, and take it in the manner in which it's been prescribed. [¶] . . . [¶]

"The court finds that placement out of state is in the best interest of the minor and will produce no undue hardship for the minor. There is no equivalent facility for the minor in the State of California. The court further finds that the requirements of Family Code 7911.1 have been met."

On December 11, 2012, Nathan filed a timely appeal.

**Placement at Rite of Passage Silver State Academy**

Meanwhile, Rite of Passage in Nevada accepted Nathan for placement. He remained at juvenile hall pending interstate compact approval, and in a December 19, 2012, 15-day review report, the probation department advised the court that Nathan did not believe Rite of Passage was a suitable placement and that he felt he should have the right to decide where he was placed. He wanted to return to Aldea or, alternatively, be placed at probation camp.[5] The probation department further advised that while waiting

---

[5] As Nathan describes it in his opening brief in *Nathan III*, "Sonoma County Probation Camp, originally established by the Board of Supervisors and Superior Court in 1955, is the oldest and among the most successful commitment programs in California.

12

for interstate compact approval, Nathan was involved in numerous incidents at juvenile hall, including a mutual fight, grandstanding, disrespectful behavior toward staff, and disruptive and "overall noncompliant behavior." Nathan admitted he was purposefully misbehaving in an attempt to sabotage his placement at Rite of Passage. His efforts were unsuccessful, however, as he was placed there on January 18, 2013.

Nathan's case was scheduled for a review hearing on February 6, 2013. In a review report, the probation department reported that Nathan had been at Rite of Passage for three weeks but was not giving the program an opportunity to work for him. The department, however, believed that Nathan was "appropriately placed in a highly structured environment that [was] equipped to address his oppositional and manipulative behaviors," explaining, "According to ROP staff, the minor has made a fair adjustment to the program so far. They reported Nathan is acclimating to the program's rules and structure; however, he has made it clear that he does not intend to remain there for long, as he intends to ask the court to vacate placement at his review hearing. Nathan does not feel that ROP will benefit him and he indicated he is not amenable to seeing what he can gain from the program. As noted in the last 15 day review dated January 15, 2013, Nathan purposefully escalated in Juvenile Hall in order to sabotage his placement at ROP. In addition, while he was detained pending placement, Nathan consistently challenged Probation's decision to place him at ROP and alleged that the undersigned promised him that he could return to Aldea. Nathan has requested that the court modify his orders and commit him to the Departmental Commitment Program (DCP) as he feels that Probation Camp would be in his best interest."

---

The program is designed to address anti-social/illegal behavior and thinking patterns in youth, while promoting an acceptance of personal responsibility for their decisions and behavior. This is accomplished through the individual development of academic and vocational skills which are necessary to navigate in modern society. These skills, along with the therapeutic component of the Camp program, provide youth with the tools they need to develop into responsible and productive members of the community (http://www.sonoma-county.org/probation/juvenile_facilities/probation_camp.htm [as of July 7, 2013].)"

13

At the February 6 hearing, however, counsel for Nathan informed the court that Nathan had had a change of heart and wanted to stay at Rite of Passage. He had been there three weeks, and was, according to counsel, "doing fairly well. He's had a few bumps in the road that they tell me are normal for kids transitioning to the program up there. And he is on track to . . . [¶] . . . [¶] Mainstream within the next 10 days or so, which they tell me is right on track. I believe Nathan would like to remain at ROP and successfully complete the program." Nathan's Rite of Passage case manager spoke at the hearing, confirming that Nathan had done everything asked of him and was "right where he should be in the program," despite "a few minor bumps in the road that are normal adjustment period."

Nathan also confirmed that he wanted to stay at Rite of Passage because he realized what was at stake. He apologized that he previously had a negative attitude about the program, and he recognized that he had had minor incidents since his arrival, but he did not want to go back to juvenile hall, so he was going to try "even harder" to mainstream and "get [his] levels" at Rite of Passage.

The court continued Nathan's placement at Rite of Passage, advising him to "make the most of it" because "[t]his is your last shot."

**Nathan's Discharge From Rite of Passage**

Two months later, the probation department filed a section 777 notice of probation violation, advising that Rite of Passage had discharged Nathan from the program due to noncompliance with the program rules and he had been detained in juvenile hall since his discharge. It recommended he be ordered to serve 270 days in juvenile hall and that all proceedings be dismissed upon time served.

On April 22, the court held a contested hearing on the section 777 petition. Nathan's probation officer testified that Nathan had been involved in a physical altercation with another Rite of Passage resident and that he refused to take responsibility and comply with the rules when he was placed in "refocus." He was subsequently discharged "because of his aggression towards other residents, the safety of the program, and his refusal to take accountability for his actions and work the program." She

14

confirmed that as of April 19, Rite of Passage was not willing to accept Nathan back into their program.

Nathan testified at the hearing, first describing the fight that lead to his discharge from Rite of Passage. In his version, the other resident hit him first; he then struck back in self-defense. Nathan also testified that while in refocus, he was performing the tasks required of him. He labeled the probation officer's testimony that he was not completing the refocus process "absolutely false." Nathan informed the court that he did not want to return to Rite of Passage, describing it as "a very negative environment": "I don't like to fear for my safety. I don't like to have fear for my stuff being stolen out of my room, my hygiene, my brushes, my shirts, my clothes. That's not the environment that I want to be in, and I don't think that's going to help me learn and grow as a person."

At the end of testimony and following closing argument, the court found Nathan in violation of the terms of probation due to his discharge from ROP and continued the matter to May 6 for disposition.

**Supplemental Disposition Report**

In a supplemental disposition report, the probation department detailed the problems Nathan had at Rite of Passage. In February, less than a month after he first arrived there, Nathan became confrontational with a coach, calling him a "bitch." Nathan resisted efforts by the staff to calm him down, continuing to be verbally disrespectful. He then shoved the coach and had to be restrained. Nathan denied any responsibility for the incident, claiming the staff was being verbally abusive towards him. In March, Nathan was involved in a physical altercation with another resident. He characterized it as horseplay, although the staff believed it was a fight. And on March 29, 2013, Nathan was involved in another altercation with a resident. What began as an argument during class turned physical when Nathan began striking the other resident as they walked out of the classroom. The other resident struck back before they were separated. Staff and other residents confirmed Nathan instigated the fight. He was placed in "refocus" but refused to do the work, repeatedly stating that he did not want to be in the program. He also refused to take responsibility for the fight, claiming he did not strike first and, in fact, had

15

his hands up when he was struck. Because he was not taking responsibility for his actions and was refusing to "work" the program, he was discharged.

In terms of case assessment and service plan, the probation department summarized:

"Seventeen-year-old Nathan Z. appears before the Court following a violation of probation based on his discharge from placement at Rite of Passage Silver State Academy. This was the second placement for Nathan, having been discharged from Aldea after only three weeks when he was involved in a confrontation with a student and a teacher. At Rite of Passage, Nathan continued to show aggression toward staff and other residents, culminating in a fight with another resident where Nathan struck the resident repeatedly.

"Nathan has a lengthy history with the juvenile justice system. Attempts at rehabilitation through ACT, DAAC counseling and placement have been unsuccessful, as Nathan has continued to commit crimes, use illicit substances and failed to abide by the most basic terms of probation. While in placement, Nathan made it clear to [Rite of Passage] and Probation that he did not want to be in the program and he put forth minimal effort in taking advantage of the services provided at ROP. Throughout his probation history, Nathan has accepted little responsibility for his actions, instead choosing to place blame on others or accuse others involved of falsely reporting the incidents.

"Nathan's violent behavior, coupled with his inability to see any wrong-doing on his part, makes him a significant threat to the community. He has been afforded numerous opportunities to receive treatment and address his anger and aggression issues, yet, he has failed to take advantage of these opportunities. At this time, it is felt that all attempts at rehabilitation have been exhausted and Nathan's resistance to placement leaves little to offer. Unfortunately, because of Nathan's on-going behavior problems, his inability to accept responsibility for himself and his failed attempts in placement, this department is recommending the minor serve time in Juvenile Hall. We recommend he be ordered to serve 270 days in Juvenile Hall with all proceedings dismissed upon time

16

served. This term will be completed at the time Nathan turns 18. It should be impressed upon Nathan that, should he engage in any violent conduct while serving his term, there is the possibility of additional time being imposed and, should he be of age, this term could be served at the Main Adult Detention Facility."

**Disposition**

The matter came on for disposition on May 6, with the district attorney submitting on the probation department's recommendation.

Nathan read a letter to the court in which he finally acknowledged that he—not his family, not his friends, not the court—was responsible for his problems. He stated that he did not want to be the person he had become and he wanted to change, acknowledging he needed help with his anger, school, and his relationship with his mother. He also acknowledged that he had been given many chances and was prepared for whatever disposition the court was going to impose, and he was going to do his best to change, regardless.

Nathan's counsel urged the court to impose a shorter confinement in juvenile hall than the recommended 270 days or to consider an alternative placement like probation camp.

The court then gave a lengthy and detailed exposition of Nathan's extensive history with the juvenile justice system. It also identified one of the primary causes of Nathan's problems as his refusal to take responsibility for his actions, instead blaming his troubles on everyone else:

"[O]ver the three years or so that you've been with us, it's been the school versus you; probation versus you; mom versus you; grandparents versus you; ACT program versus you; the court versus you; Aldea versus you; ROP versus you; the juvenile hall staff in Sonoma County versus you; the juvenile hall staff in Napa versus you. I think maybe you see the one constant: It's always you. [¶] . . . [¶]

"So there has been someone who has tried to stand in your way at every step in this process, beginning back in November of 2010. And next time you get back to the unit take a look in a mirror and you'll see that fellow. [¶] Because he has blocked your

17

way at every opportunity.  You are solely responsible for where you are.  You are solely responsible for demonstrating that you are a threat to the community's safety.  You are solely responsible for each and every day that you will spend detained.

"In the past I've always offered you a carrot.  And the only carrot I can offer you at this point is the passage of time.  And that is, there are 24 hours in a day, seven days in a week, 30 or 31 days in a month, and 365 days in a year, and they will pass.  And that's the skill that you will learn."

With that, the court vacated the prior placement order, revoked Nathan's probation, and ordered him confined in juvenile hall for 868 to 1,855 days, with credit for 434 days served.  It also ordered no early release, good time credit, or juvenile hall alternatives to detention.

Nathan timely appealed from the disposition order.  (*Nathan Z. III*, A138745.)

On November 8, 2013, we ordered Nathan's appeals in *Nathan Z. II* and *Nathan Z. III* consolidated for purposes of oral argument and decision.

## NATHAN'S ARGUMENTS

In *Nathan Z. II*, Nathan challenges the court's order requiring him to take all medications as prescribed, an argument that is three-fold:  (1) the order was constitutionally overbroad on its face; (2) it was overbroad as applied to him because it lacked sufficient medical support; and (3) the court failed to assure compliance with mandatory statutory requirements before requiring him to take antipsychotic medication.  He also contends the juvenile court abused its discretion in finding that out-of-state placement was in his best interest and would produce no undue hardship for him.

In *Nathan Z. III*, Nathan challenges his juvenile hall commitment on the following four grounds:  (1) the length of his commitment was an abuse of discretion because it was contrary to the rehabilitative purposes of the juvenile justice system; (2) the lengthy commitment was statutorily unauthorized; (3) he was denied his federal and state rights to equal protection because the court did not schedule periodic reviews and there was no opportunity for parole; and (4) the court lacked jurisdiction to order a commitment that could extend beyond his twenty-first birthday.

18

**DISCUSSION**

*Nathan Z. II*

**1.     Preliminary Issues**

We begin with the question whether Nathan's appeal in *Nathan Z. II* is moot in light of his discharge from Rite of Passage and subsequent juvenile hall commitment. We requested briefing from counsel on this issue, which timely briefing we received.

The People are of the opinion that the issues raised by Nathan are moot. They note that he is no longer in the out-of-state placement, and the juvenile court expressly vacated that placement order. Similarly, the medication condition was imposed as a condition of probation, but Nathan's probation was revoked by the disposition order committing him to juvenile hall. Thus, according to the People, Nathan has already received the relief he seeks in *Nathan Z. II*, and any order of reversal would be "without effect."

Nathan, on the other hand, urges us to decide both issues. He acknowledges that an appellate court will generally not decide moot issues, but asks that we exercise our discretion to do so here. Among other arguments, Nathan contends that as to the out-of-state placement issue, the erroneous placement order could have affected the juvenile hall commitment and, as such, is still relevant. And Nathan's counsel represents that he is still being given psychotropic medication while detained in juvenile hall.

We agree with Nathan that these issues merit our consideration, and we will thus exercise our discretion and decide them. (See, e.g., *Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 867 [general rule regarding mootness is tempered by court's discretionary authority to decide moot issues].)

**2.     The Probation Condition Requiring Nathan to Take All Medication In the Manner It Was Prescribed Was Overbroad on Its Face**

As noted above, the November 16, 2012 disposition order required that Nathan, as a term of his probation, take all medication as prescribed. According to Nathan, this term was unconstitutionally overbroad on its face and as applied to him. He concedes, however, that his counsel registered no objection to this term when it was imposed, thus

19

raising a question as to whether the challenge has been preserved for appeal. The California Supreme Court answered a similar question in *In re Sheena K.* (2007) 40 Cal.4th 875, where it considered a minor's constitutional challenge to a probation condition ordering that the minor " 'not associate with anyone disapproved of by probation.' " (*Id.* at p. 878.) There, like here, counsel had made no objection to the condition when imposed by the juvenile court. (*Id.* at 879.) The Supreme Court held that where the alleged error is "capable of correction without reference to the particular sentencing record developed in the trial court" and, as such, "present[s] a pure question of law," it can be addressed on appeal, even if there was no objection below. (*Id.* at p. 887.) Nathan's claim that the probation condition is overbroad on its face satisfies these criteria, and we therefore address this argument.

Pursuant to section 727, subdivision (a), once a minor is adjudged a ward of the juvenile court, "the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor, including medical treatment . . . ." And when a ward is placed under the supervision of a probation officer, "[t]he court may impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced." (§ 730, subd. (b); see also *In re Sheena K., supra,* 40 Cal.4th at p. 889.)

The juvenile court's discretion in imposing probation conditions is not unfettered, however. A condition of probation that impinges on a constitutional right must be "tailored carefully and reasonably related to the compelling state interest in reformation and rehabilitation." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153; see also *In re Sheena K., supra,* 40 Cal.4th at p. 890; *In re Luis F.* (2009) 177 Cal.App.4th 176, 185.) Nathan argues that the medication condition infringed on his rights to privacy and his "liberty interests in bodily integrity and self-autonomy" but that it was not narrowly tailored, nor was it related to his reformation and rehabilitation. We agree.

The medication condition required Nathan to take *all* medication as prescribed. It was not limited to medications previously prescribed or medications prescribed to treat a

20

diagnosed mental condition that contributed to his delinquency. As Nathan puts it, it would require him to take "cough medication, allergy medication, antifungal or antibacterial medication . . . ." Failure to take one of these prescribed medications could have subjected Nathan to a probation violation, yet such prescriptions in no way relate to his reformation and rehabilitation.

The People concede the overbreadth of this medication condition by suggesting that we modify it to read, "You are to take any prescribed medication for your psychological condition(s), and take it in the manner in which it has been prescribed." (See *In re Luis F., supra,* 177 Cal.App.4th at p. 184 [modifying probation condition to incorporate the implied limitation that the term applied only to medications addressing the minor's psychological condition].) We decline to adopt such a modification, however, because, as explained *post*, the record contains no evidence demonstrating Nathan's need to take medication to treat a psychological condition.

### 3. A Narrowed Condition Requiring Nathan To Continue Taking Seroquel Would Be Improper Because It Lacks Sufficient Medical Basis

Nathan alternatively contends that even assuming the medication condition was intended to apply to Seroquel—the only prescription medication he was taking at the time of the disposition order—the condition would still be improper, because it lacked sufficient medical basis. Unlike his claim that the condition was unconstitutionally overbroad, this argument does not present a pure question of law that can be determined "based on abstract and generalized legal principles." (*In re Luis F., supra,* 177 Cal.App.4th at p. 182.) Rather, the appropriateness of the probation condition depends on the facts in the record. (*See ibid.*) Given the absence of objection by counsel below, this challenge would typically be forfeited. (*Id.* at p. 181–182; *In re Sheena K., supra,* 40 Cal.4th at p. 889.) But we are troubled by the seemingly perfunctory manner in which the court imposed the medication probation condition, as well as the fact that Nathan is still being given psychotropic medication while in juvenile hall, despite that his probation—and with it the medication condition—was revoked. Therefore, as we did in *In re Luis F., supra,* 177 Cal.App.4th at pp. 183–184, we elect to consider the merits of

21

Nathan's claim, despite his lack of objection. (*See also In re Sheena K, supra,* 40 Cal.4th at pp. 887–888, fn. 7 [appellate court may exercise its discretion to review a forfeited claim]; accord *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6; *People v. Ellison* (2003) 111 Cal.App.4th 1360, 1370; *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649; 6 Witkin & Epstein, Cal. Criminal Law 4th ed. 2012), Reversible Error, § 43, p. 574 ["[t]he fact that a party, by failing to raise an issue below, may forfeit the right to raise the issue on appeal does not mean that an *appellate court* is precluded from considering the issue."].)

According to the probation officer's report, Nathan reported that he was taking Seroquel "for sleep." A November 5, 2012 screening assessment and case plan appended to the report indicated that the Seroquel had been prescribed by a Dr. Williams Evans. There is no indication in the record who this physician was, what his specialty was, why he was treating Nathan, for what condition, if any, he had diagnosed Nathan, or why or when he prescribed the drug. According to the probation report, Nathan was diagnosed with oppositional defiant disorder and had unspecified "emotional mental health disabilities," but there is no evidence the Seroquel was prescribed to treat his oppositional defiant disorder or any other mental health disorder. Quite simply, aside from Nathan's representation that he was taking Seroquel as a sleep aid, the record is completely silent as to why he was being given this antipsychotic medication.

Curiously, the People claim, "The record shows that the medication was prescribed to address [Nathan's] oppositional defiance disorder, his sleep issues, and his acknowledged 'anger and impulse control issues.' " In claimed support, they cite page 502 of the clerk's transcript. That is a page in the November 16, 2012 probation report containing a one-paragraph summary of Nathan's "Medical/Mental Health." It says this in its entirety: "Nathan did not report any current medical problems. He acknowledged that he continues to struggle with anger and impulse control issues, and he noted that he is taking Seroquel for sleep. Both the minor's mother and probation records indicate that he has been diagnosed with Oppositional Defiant Disorder. Regarding his medication, the minor's mother stated that she 'hates' Seroquel and 'wants him off it' because she

worries 'about the effects on his brain.' As noted in prior reports, she has a history of depression." That, according to the People, is the evidence that the Seroquel was prescribed to treat Nathan's "oppositional defiance disorder, his sleep issues, and his acknowledged 'anger and impulse control issues.' " To this we simply say, nonsense. The record contains no such evidence.

In short, assuming the probation condition requiring Nathan to take all medication as prescribed was intended to apply to Seroquel—the only prescription medication he was taking—there was no evidence demonstrating that the drug was necessary for him. And the record is completely devoid of any evidence suggesting that the probation condition was reasonably related to Nathan's reformation and rehabilitation. As such, it was an abuse of the juvenile court's discretion to order him to continue taking Seroquel as prescribed. The condition must therefore be stricken. In light of this conclusion, we need not consider Nathan's additional argument that the juvenile court failed to assure compliance with mandatory statutory requirements before requiring him to take a psychotropic medication.

### 4. The Juvenile Court Did Not Abuse Its Discretion In Issuing a General Placement Order with Out-Of-State Options

Nathan's final argument in *Nathan Z. II* challenges the juvenile court's disposition order continuing him in placement with an out-of-state option. As recently summarized in *In re Oscar A.* (2013) 217 Cal.App.4th 750, 755–756, " 'We review a juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision.' ' "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." ' We will not disturb the juvenile court's findings when there is substantial evidence to support them. ' "In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law." ' "

The relevant portion of the juvenile court law is, in part, encompassed in section 202, subdivision (a), which provides: "The purpose of this chapter is to provide for the

protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public.  If removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective.  If the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents.  This chapter shall be liberally construed to carry out these purposes."

Section 202, subdivision (b) provides:  "Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances.  This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter.  If a minor has been removed from the custody of his or her parents, family preservation and family reunification are appropriate goals for the juvenile court to consider when determining the disposition of a minor under the jurisdiction of the juvenile court as a consequence of delinquent conduct when those goals are consistent with his or her best interests and the best interests of the public.  When the minor is no longer a ward of the juvenile court, the guidance he or she received should enable him or her to be a law-abiding and productive member of his or her family and the community."

The court has broad discretion to select a form of custodial confinement that it considers to be in the minor's best interest.  (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.)  When selecting a form of confinement, the court must consider the probation officer's disposition report and other relevant factors, including  the minor's age, the circumstances and gravity of the offense, and the minor's previous delinquent history.  (§§ 706, 725.5.)  Placement options include the home of a relative or extended family member; a suitable licensed community care facility or foster home; juvenile hall; a

24

ranch, camp or forestry camp; and, the most restrictive setting, the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF).  (§§ 727, subd. (a), 730, subd. (a), 731, subd. (a)(4); see also *In re Greg F.* (2012) 55 Cal.4th 393, 404.)  If a court orders a minor placed out of state, it must first find that in-state facilities or programs are unavailable or inadequate to meet the minor's needs.  (§ 727.1, subd. (b)(1).)

Applying these guidelines here, we conclude that the juvenile court was within its discretion in issuing a general placement order with an out-of-state option.  We have exhaustively detailed Nathan's lengthy history of failures while on probation, and we need not repeat that history here.  But that history provides more than substantial evidence to support the juvenile court's finding that there was no in-state facility that was adequate for Nathan's needs and that an out-of-state program was in his best interest.

To briefly summarize, Nathan had incurred nine petitions and countless probation violations.  The court had tried a wide variety of dispositions, from home probation to community detention to the Aldea group home, but Nathan failed at all of these.  He had been ordered to complete the DAAC and ACT programs, but he completed neither one.

Compounding the foregoing was Nathan's propensity towards violence.  He had been involved in numerous physical altercations, including with his mother, law enforcement officers, a teacher, and multiple peers.

Nathan also had a documented history of repeatedly running from law enforcement.  And he had a pattern of absconding while on probation.  In fact, when interviewed by the probation department following his sixth petition, Nathan threatened to run from any placement, expecting that he would ultimately be arrested and ordered to serve his remaining time in juvenile hall.

In light of Nathan's history and problems, the probation department informed the court that Nathan would benefit from a structured setting, isolation from community, counseling, on-site schooling, and substance abuse classes that would be offered by an out-of-state placement.  Indeed, at the April 10, 2012 disposition hearing following Nathan's seventh petition, his own counsel recognized that he would benefit from the

25

structured environment offered by an out-of-state program, urging the court to consider alternatives to juvenile hall, "whether it's the camp program or something like out-of-state placement. A structured program is what this young man needs." The court's disposition order was consistent with these recommendations.

Nathan argues that the court should have considered in-state placements, including probation camp and Aldea. But the departmental screening committee had evaluated Nathan's case, ruling out camp as an option due to his lack of impulse control, immaturity, and inability to comply with rules, as well as the dangers inherent in the camp environment given the presence of tools. And Nathan had previously been placed at Aldea, but he was there for only three weeks when he incurred another petition, this one for charges that included assaulting a teacher. The court could thus have concluded that neither placement was a viable option.

Given this record, combined with the court's concern that Nathan continued to refuse to take responsibility for his actions, we easily conclude there was substantial evidence to support the juvenile court's finding that out-of-state placement was in Nathan's best interest and that there was no adequate facility in California. As such, there was no abuse of discretion.

*Nathan Z. III*

**1. Preliminary Issues**

Before turning to the merits of Nathan's arguments concerning his juvenile hall commitment, we address two preliminary assertions made by the People. First, they contend Nathan forfeited his right to challenge the length of his juvenile hall commitment because he did not object to the length of the commitment below. As they explain it, the parties discussed Nathan's maximum time of confinement and his credits, but he never objected to the numbers, thereby forfeiting his right to challenge the length of his detention. But Nathan's counsel urged the court to give Nathan "another opportunity to do a shorter sentence in the hall [than the 270 days recommended by probation] or even the camp program, which is suggested." And Nathan pleaded with the court to "please reconsider . . . . And just, please, . . . stay here until I'm 18. I'm begging you. I really

26

can't serve that much time. Please." Nathan and his counsel were clearly objecting to the imposition of a lengthy juvenile hall commitment, and this was sufficient to preserve the issue for appeal.

Second, the People claim that the law of the case doctrine bars Nathan from challenging the length of his juvenile hall detention. This is so, they contend, because in *Nathan I*, he unsuccessfully challenged his first lengthy juvenile hall commitment, asserting many of the same grounds asserted here. In claimed support, they cited *People v. Cooper* (2007) 149 Cal.App.4th 500, 524 for the proposition that "the law-of-the-case doctrine prevents parties from seeking appellate reconsideration of an already decided issue in the same case." This argument borders on disingenuity. The doctrine does not apply here, as the two appeals challenged two different juvenile hall commitments imposed under different circumstances.

### 2. The Juvenile Hall Detention Order Did Not Constitute an Abuse of Discretion

Nathan challenges the May 6, 2013 disposition order ordering him confined at juvenile hall for 868 to 1,855 days. Again, we review this challenge for an abuse of discretion. (*In re Oscar A., supra,* 217 Cal.App.4th at pp. 755–756.) Again, we find none.

Nathan does not dispute that the court was authorized to order him committed to juvenile hall. Rather, he disputes the length of the confinement, contending that it was punitive, rather than rehabilitative, which contravenes the stated purpose of the juvenile court law. He is correct that juvenile proceedings are intended "to be primarily rehabilitative, disallowing punishment in the form of retribution." (*In re Julian R.* (2009) 47 Cal.4th 487, 496.) But the court may order a disposition that includes a form of punishment, provided it is punishment in the form of sanctions, rather than retribution. (§ 202, subd. (b), (e).) And it is specifically stated that permissible sanctions include "[c]ommitment of the minor to a local detention or treatment facility, such as a juvenile hall, camp, or ranch." (§ 202, subd. (e)(4).)

27

Moreover, it has long been recognized that while a commitment to juvenile hall may arguably be viewed as punitive, it also serves the overall purpose of rehabilitating a minor. (*In re Ricardo M.* (1975) 52 Cal.App.3d 744, 748–749.) "The purpose of such a confinement order is to impress upon the juvenile the seriousness of the misconduct, without the imposition of a more serious commitment." (*In re Ronny P.* (2004) 117 Cal.App.4th 1204, 1207.) "The confinement order informs the juvenile that continued misconduct will lead to even more serious consequences and thus encourages rehabilitation." (*Ibid.*) Here, the court's disposition conformed with the policies set forth above.

Nathan continued to violate the law after being placed on home probation and community detention, in juvenile hall for short detentions, at the Aldea group home, and at Rite of Passage. He had been warned that Rite of Passage was his last chance, and that a lengthy juvenile hall commitment would result if he failed to perform at Rite of Passage. Given his criminal history and the nature of the current offense, the juvenile court could reasonably had concluded that it had no other option than to order Nathan to serve a lengthy juvenile hall commitment. Under the circumstances, we cannot say it exceeded the bounds of reason to conclude that such a disposition was the most appropriate for rehabilitative purposes and to protect the public.

### 3.    The Detention Was Statutorily Authorized

Nathan additionally contends that, regardless of the circumstances of his case, the lengthy detention imposed was statutorily unauthorized. This was so, he claims, because juvenile hall is intended for "detention and temporary placements," not for lengthy postdisposition confinement. But he cites no authority supporting his position, and the applicable statutes do not prohibit such a commitment.

As set forth above, section 202, subdivision (e) identifies the permissible sanctions the court may impose upon a minor, including "[c]ommitment of the minor to a local detention or treatment facility, such as juvenile hall, camp, or ranch." No other provision limits the length of a commitment to juvenile hall. And, as noted, a lengthy juvenile hall confinement serves the overall purpose of rehabilitating the minor by impressing upon

28

the minor the seriousness of his or her offense. (*In re Ronny P., supra,* 117 Cal.App.4th at p. 1207; *In re Ricardo M., supra,* 52 Cal.App.3d at p. 749.) The juvenile court had broad flexibility to craft orders aimed at rehabilitating a ward. (*In re Greg. F., supra,* 55 Cal.4th at p. 411), and we are aware of no authority prohibiting the court from ordering a lengthy juvenile hall confinement as part of that discretion.

### 4. The Commitment Did Not Deprive Nathan of His Right to Equal Protection

Nathan next contends that the commitment deprived him of his state and federal rights to equal protection because he was not afforded periodic reviews and he had no possibility of early release or parole. This argument has no merit.

The Equal Protection clauses of the Fourteenth Amendment to the United States Constitution and Article I, section 7 of the California Constitution guarantee that that those who are similarly situated will receive like treatment under the law. (*People v. Guzman* (2005) 35 Cal.4th 577, 591–592; *People v. Ward* (2008) 167 Cal.App.4th 252, 257–258.) Here, Nathan submits that he, as a minor subject to a lengthy commitment at juvenile hall, is similarly situated to a minor who is placed at other institutions such as the DJF because they are both subject to "physical confinement." But, he complains, they are treated differently because if a minor is placed other than at juvenile hall, section 727.1, subdivision (d) provides for six-month reviews. Moreover, a minor committed to DJF is eligible for parole. (§ 1176.) In Nathan's case, however, there is no provision for regular review, and the court ordered that there is to be no parole or early release.

Minors committed to juvenile hall for a lengthy term and minors committed to the DJF are not similarly situated, however. Wards placed at juvenile hall remain under the jurisdiction of the juvenile court, are subject to probation conditions, and may not be detained past age 21. (See §§ 202, 208.5, 607.) By contrast, wards may only be committed to the DJF after being found to have committed serious offenses, such as specified violent felonies and/or sex crimes subject to lifetime sex offender registration. (§§ 731, 733, 707, Pen. Code, § 290.008.) While a ward committed to the DJF is

technically under the jurisdiction of the juvenile court, his or her "treatment and rehabilitation—including physical confinement and parole—are placed under the direct supervision of [the DJF] rather than the juvenile court." (*In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1324–1325.) Specific statutes authorize wards at DJF to be detained until age 25 and to be placed on supervised parole. (§§ 607, 707.) In short, wards confined in juvenile hall are not similarly situated to wards committed to the DJF.

### 5. The Statutory Age Limit Governing the Juvenile Court's Jurisdiction Over Nathan Will Control Over His Maximum Time of Confinement

In the last issue before us, Nathan contends that the disposition order must be reversed because it improperly provided for commitment beyond his 21st birthday. Specifically, his maximum time of confinement is 1,421 actual days, which would mean confinement until March 2017.[6] However, he argues, he will turn 21 years old on January 4, 2017, at which time the juvenile court will lose jurisdiction over him.

Nathan is correct that the juvenile court's jurisdiction over him will terminate on his 21st birthday. (§ 607, subd. (a) [court retains jurisdiction over a ward of the juvenile court until the ward attains 21 years of age].) We need not remand for the court to modify the order, however, because when the maximum time of confinement conflicts with the age limit established by section 607, the latter prevails. (See, e.g., *In re Thomas C.* (1986) 183 Cal.App.3d 786, 802 [where maximum period of physical confinement of a ward at the DJF was lengthier than the age ceiling for confinement at the facility, the statutory age limit governed].)

## DISPOSITION

The probation condition requiring Nathan to take all medication as prescribed is stricken from the November 16, 2012 disposition order. In all other regards, the disposition orders of November 16, 2012, and May 6, 2013 are affirmed.

---

[6] See fn. 2, *ante.*

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Haerle, J.