[No. B200354. Second Dist., Div. Seven. Oct. 1, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD A. WARD, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part I. of the Discussion.

COUNSEL

Lise M. Breakey, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Paul M. Roadarmel, Jr., and Lauren E. Dana, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ZELON, J.—Ronald A. Ward, convicted of sale of a controlled substance (Health & Saf. Code,[1] § 11352, subd. (a)) and possession of cocaine base for sale (§ 11351.5), appeals his conviction and sentence, contending that his motion for discovery of police officers' personnel records should have been granted and that section 11351.5 violates his constitutional rights to due process and equal protection of the laws. We reject Ward's due process and equal protection claims but hold that the trial court should have conducted an in camera review of documents pertaining to two police officers. Accordingly, we conditionally reverse the conviction and remand for further proceedings on the discovery motion.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 1, 2006, Los Angeles Police Department Narcotics Officer Alonzo Williams, wearing a one-way transmitter, approached a man named Derrick Sutton on Ceres Street in an area known for drug sales. Sutton asked Williams what he needed, and Williams responded that he needed a dime, or

---

[1] Unless otherwise indicated, all further statutory references are to the Health and Safety Code.

$10 worth of narcotics. Sutton, apparently suspicious of Williams, said he would not make a sale until he saw Williams smoke a pipe of drugs. Williams refused and was beginning to walk away when Ward approached.

As Ward walked past Williams, Sutton said to Ward, "Serve him a dime." Williams stopped walking and turned toward Ward, who reached into his right pocket and instructed Williams to drop the money on the ground. Williams dropped the money as directed, on a green tent, and Ward threw a plastic-wrapped rock of what appeared to be cocaine base. Ward pointed at the item he threw and told Williams that it was right there. Williams picked up the object, walked away, and gave other officers a signal that he had completed a buy.

Officers arrested Sutton and Ward. From Sutton the police recovered $477 in cash and the marked $10 that Williams had dropped to pay for the drugs he purchased. Police found various bills and two glass pipes on Ward, and they recovered 13 prewrapped off-white rocks, approximately the same size as the one given to Williams, that they had seen Ward toss at the time that the police arrived.

Ward was charged with sale of a controlled substance and with possession of cocaine base for sale. Prior to trial, Ward sought to discover information about complaints filed about or investigations of 19 different officers involved in the undercover operation with respect to acts of moral turpitude, including false arrests, planting evidence, illegal searches and seizures, dishonesty, fabrication of evidence, fabrication of police reports, fabrications of probable cause, false testimony, or perjury. After a hearing, the court denied the discovery motion.

At trial, Williams testified about the transaction. Police Detective Vip Kanchanamongkol (who had searched Sutton) identified Sutton, testified as to the search he performed, and opined that a person who was observed to sell rock cocaine and who possessed 13 similar packages, $55 in small bills, and two glass pipes in a high narcotics area was likely to possess the drugs for the purposes of sale.

Police Officer Hector Diaz testified that he watched Williams and Sutton have a brief conversation, that Ward approached and spoke with Sutton and then with Williams, and that he saw Williams place something down on a

green tent. He then saw Ward throw something to the ground that Williams then picked up; Williams walked away and Sutton picked up the item Williams had placed on the green tent. Diaz directed the uniformed officers to come to the scene, and as the patrol cars arrived, he saw Ward walk to a blue tarp and discard an unknown number of off-white solids. Diaz directed Detective Sylvia Ruize to recover those items. Ruize testified that she photographed the rocks on the blue tarp and then collected them.

Officer Daniel Diaz testified that he arrived on the scene after Sutton and Ward had been arrested and that he found a bill in the $477 that was handed to him that matched the bill photocopied in advance by Williams. Officer Michael Simon testified that he and his partner were the ones who detained Ward and that he had searched him, recovering $54 and two pipes.

Criminalist Aaron McElrea testified that the rocks collected by the police were in fact cocaine base.

Ward was convicted as charged. He appeals.

## DISCUSSION

### I. *Pretrial Discovery**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. *Equal Protection and Due Process*

Ward contends that the higher statutory sentence for possession for sale of cocaine base (§ 11351.5) versus possession for sale of powder cocaine (§ 11351) violates substantive due process and his right to equal protection of the laws. He argues that the distinction does not rationally serve a legitimate state interest (violating substantive due process) and does not serve a compelling state interest (failing strict scrutiny and violating equal protection).

■ The federal and state equal protection clauses (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7) prohibit the state from arbitrarily discriminating among people subject to its jurisdiction. The guarantee has been defined to mean that all persons under similar circumstances are entitled

---

*See footnote, *ante*, page 252.

to and given equal protection and security in the enjoyment of personal and civil rights and the prevention and redress of wrongs. (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1383 [24 Cal.Rptr.3d 834].) Those who are similarly situated with respect to the purpose of the law shall receive similar treatment. (*Ibid.*) " ' "Under the equal protection clause, '[a] classification "must be reasonable, not arbitrary, and must rest upon some grounds of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." ' " [Citations.]' [Citation.]" (*Ibid.*) The equal protection guarantee, " 'however, does not prevent the state from drawing distinctions between different groups of individuals but requires the classifications created bear a rational relationship to a legitimate public purpose.' [Citation.]" (*People v. Chavez* (2004) 116 Cal.App.4th 1, 4 [10 Cal.Rptr.3d 556].)

■ Ward contends, citing *People v. Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], that because his liberty is involved here we should apply strict scrutiny in reviewing his equal protection claim. While *People v. Olivas* did hold that "personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions" (*id.* at p. 251), the California Supreme Court has subsequently rejected the argument that the *Olivas* decision means that strict scrutiny is applied "whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals." (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837 [16 Cal.Rptr.3d 420, 94 P.3d 551].) Instead, the Supreme Court has said that the rational basis test applies to equal protection challenges based on sentencing disparities. (*Id.* at p. 838; see also *U.S. v. Harding* (9th Cir. 1992) 971 F.2d 410, 412 (*Harding*) [applying a rational basis test on equal protection review of federal law imposing a higher punishment for possession of cocaine base than cocaine powder]; *U.S. v. Thomas* (4th Cir. 1990) 900 F.2d 37, 39 [same].)

■ Ward's due process argument leads to the same inquiry: a rational basis review of the law. "Substantive due process . . . deals with protection from arbitrary legislative action, even though the person whom it is sought to deprive of his right to life, liberty or property is afforded the fairest of procedural safeguards. In substantive law such deprivation is supportable only if the conduct from which the deprivation flows is prescribed by reasonable legislation reasonably applied, i.e., the law must not be unreasonable, arbitrary or capricious but must have a real and substantial relation to

the object sought to be attained." (*Gray v. Whitmore* (1971) 17 Cal.App.3d 1, 21 [94 Cal.Rptr. 904].) "The test of legislation under the due process clause of the Constitution is that there be some evidence on the basis of which the Legislature could enact the statute. [Citations.] Accordingly, no valid objection to the constitutionality of a statute under the due process clause may be interposed 'if it is reasonably related to promoting the public health, safety, comfort, and welfare, and if the means adopted to accomplish that promotion are reasonably appropriate to the purpose.' [Citations.]" (*People v. Aguiar* (1968) 257 Cal.App.2d 597, 602 [65 Cal.Rptr. 171].)

■ The Supreme Court has recognized the strong presumption that legislative enactments must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. (*People v. Morgan* (2007) 42 Cal.4th 593, 605 [67 Cal.Rptr.3d 753, 170 P.3d 129].) Ward has not made a showing that would defeat this presumption. Ward's entire argument that the statutory scheme is unconstitutional turns on the idea that the drugs are the same, so that possessing cocaine base and cocaine powder are identical crimes punished differently. Both cocaine base and cocaine powder are, of course, forms of cocaine (*People v. Howell* (1990) 226 Cal.App.3d 254, 261 [276 Cal.Rptr. 454]), but they are not chemically identical, as noted by the court in *People v. Adams* (1990) 220 Cal.App.3d 680, 686 [269 Cal.Rptr. 479] and implicitly conceded by Ward when he asserts that cocaine base is cocaine powder cooked with baking soda. ■ The two substances, while related, are not the same: "Suffice to note, cocaine base is not cocaine hydrochloride although both substances are cocaine." (*Howell*, at p. 261.) The Legislature has elected to treat these related compounds (*ibid.*) as different drugs. In the California Uniform Controlled Substances Act (Health & Saf. Code, § 11000 et seq.), California adopted the five schedules of controlled substances used in federal law and in the Uniform Controlled Substances Act. (2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Public Peace and Welfare, § 64, p. 573.) Cocaine base is a schedule I narcotic (§ 11054, subd. (f)(1)), while powder cocaine is a schedule II drug. (§ 11055, subd. (b)(6).)[4] As the two drugs are not the same, Ward's argument that the distinct punishments for possessing each substance are "[d]ifferent and disproportionate penalties [that] may not be imposed for the same crime" is contradicted by the facts.

---

[4] Although California has not adopted the portion of the Uniform Controlled Substances Act that sets forth the tests prescribed for inclusion of substances in the schedules, the drugs in schedule I have (1) a high potential for abuse and (2) no accepted medical use in treatment or lack accepted safety for use in treatment under medical supervision. (*People v. Sherman* (1997) 57 Cal.App.4th 102, 105 [66 Cal.Rptr.2d 764].) Schedule II drugs also have a high potential for abuse, but have a currently accepted medical use in treatment in the United States, or a currently accepted medical use with severe restrictions; abuse of the substance may lead to severe dependence. (2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Public Peace and Welfare, § 64, p. 574.)

To support his argument that the statutory scheme is unconstitutional, Ward relies on a bill introduced in the State Assembly (Assem. Bill No. 337 (2007–2008 Reg. Sess.)) to amend the Health and Safety Code to equalize punishments for powder cocaine and cocaine base. This bill, like others before it (Assem. Bill No. 125 (2005–2006 Reg. Sess.), Assem. Bill No. 2274 (2003–2004 Reg. Sess.)), died without being enacted. (Current Bill Status, Assem. Bill No. 337 (2007–2008 Reg. Sess.), Official Cal. Legislative Information Web site <http://www.leginfo.ca.gov/pub/07-08/bill/asm/ab_0301-0350/ab_337_bill_20080206_status.html> [as of Oct. 1, 2008].) Even if the Legislature does at some point choose to make the punishments equal for these two crimes, such a change in the law would not mean that there was no rational basis for a legislative scheme that treats possession of the two drugs differently.

Numerous federal cases have rejected the argument that the distinction between the two forms of cocaine is irrational, and we believe these cases are persuasive. We agree with the court in *Harding, supra*, 971 F.2d at page 413, when it explained, "Although crack and powder cocaine are different forms of the same drug, the routes of administration, their physiological and psychological effects, and the manner in which they are sold set the two forms of the drug apart. Crack is normally smoked in a glass pipe, while powder cocaine is most often ingested nasally. Because it is smoked, crack has a quicker and more intense effect on the brain than powder cocaine ingested nasally, causing a greater desire for more. Crack is also sold in smaller quantities and lower unit prices than powder cocaine, thereby reducing the financial barrier which had previously limited cocaine usage. [Citations.]

"In short, crack offers an easy, relatively inexpensive, and potent means for first-time users as well as addicts to experience a temporary high which leaves them craving more. [Citation.] While powder cocaine was the drug of choice for the affluent, crack has brought cocaine to the streets, catering to the habits of both rich and poor in epidemic proportions. [Citation.] The extent of this epidemic can be demonstrated by the development among police forces of special anticrack units. . . ." (Fn. omitted.)

The *Harding* court concluded, "The distinction between crack and powder cocaine is neither arbitrary nor irrational. In *United States v. Shaw*, 936 F.2d 412, 416 (9th Cir. 1991) and [*U.S.*] v. *Van Hawkins*, 899 F.2d 852, 854 (9th Cir. 1990), we held that the distinction between cocaine base and powder cocaine . . . is not unconstitutionally vague because the two substances are

objectively distinguishable. Furthermore, the penalties embodied in this statute legitimately further the important government interest of eliminating controlled substance distribution and abuse. Crack presents a much larger problem than powder cocaine, both in the number of users and the drug's effects on the individual. [Citation.] If the extent of the problem posed by the sale of crack and the need for more severe penalties than for powder cocaine are not clearly evident, these issues are at least highly debatable. This is enough to prevent invalidation of the statutory classification. [Citation.]" (*Harding, supra*, 971 F.2d at p. 414.)

We are by no means insensible to the disparities that result from the legislative decision to treat these two drugs differently for penal purposes. These disparities have been discussed extensively at the federal level. (See, e.g., *Kimbrough v. United States* (2007) 552 U.S. 85 [169 L.Ed.2d 481, 128 S.Ct. 558, 566] [differential treatment of cocaine base and powder cocaine under former sentencing guidelines "yields sentences for crack offenses three to six times longer than those for powder offenses involving equal amounts of drugs. . . . This disparity means that a major supplier of powder cocaine may receive a shorter sentence than a low-level dealer who buys powder from the supplier but then converts it to crack."]; *United States v. Armstrong* (1996) 517 U.S. 456, 469 [134 L.Ed.2d 687, 116 S.Ct. 1480] [United States Sentencing Commission "statistics show: More than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black"]; *id.* at pp. 478–480 (dis. opn. of Stevens, J.) [citing statistic that sentences for crack offenders average three to eight times longer than sentences for comparable powder offenders and observing that the higher penalties for crack cocaine offenses versus powder cocaine offenses are a primary cause of racial disparities in sentencing between Black and White criminal federal court defendants].) The differential outcomes and attendant consequences may motivate legislative action, but they do not establish that there is no rational basis for distinguishing between cocaine powder and cocaine base for sentencing purposes.

■ As there is rational support for the Legislature to enact the statutes, Ward has not established a due process violation here. (See *People v. Aguiar, supra*, 257 Cal.App.2d at p. 602.) Because Ward has not made a showing that the law treats two similarly situated groups in an unequal manner, he has not demonstrated an equal protection violation. ■ "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.]" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696].)

## DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with directions to conduct an in camera hearing on Ward's *Pitchess* motion with respect to Officers Williams and Diaz. If the trial court finds there are discoverable records, they shall be produced and the court shall permit Ward an opportunity to demonstrate prejudice and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed. If the court finds there are no discoverable records, the court shall reinstate the judgment of conviction.

Woods, Acting P. J., and Jackson, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 14, 2009, S168115. George, C. J., did not participate therein.