Filed 9/4/14  P. v. Arbuckle CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KEVIN ARBUCKLE,<br><br>    Defendant and Appellant. | A138797<br><br>(Alameda County<br>Super. Ct. No. H51273) |

Following an argument, Angie Brown decided to move out of the apartment she shared with defendant Kevin Arbuckle.  Brown refused to give Arbuckle her prepaid Visa card, onto which both Brown and Arbuckle had separate funds deposited.  As Brown sat in her parked car in the driveway to the apartment building, Arbuckle took his gun to the car, pointed it at Brown, and shot her, causing bone and nerve damage to her hand and leaving a bullet embedded in her shoulder.  Arbuckle claimed that he only meant to scare Brown into handing over her card and that the gun discharged by accident when his hand hit the car mirror.

A jury found Arbuckle guilty of shooting at an occupied motor vehicle (Pen. Code,[1] § 246) and found true the allegation that Arbuckle had personally and intentionally discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)).  The court imposed a sentence of 32 years to life in prison.

---

[1]  Unless otherwise indicated, statutory references are to the Penal Code.

1

On appeal, Arbuckle contends that the trial court prejudicially erred by failing to instruct the jury on: (1) a lesser included offense; (2) accident; and (3) proximate causation. He also contends that section 12022.53, subdivision (d), violates his right of equal protection under the law by imposing more severe punishment for an assault by firearm, causing great bodily injury, when the victim is sitting in a car rather than sitting on a curb or park bench. We find no merit in Arbuckle's contentions and affirm.

**BACKGROUND**

### I. *Procedural Background*

In an amended complaint filed on August 4, 2011, the People charged Arbuckle with two counts: (1) the premeditated attempted murder of Brown (§§ 187, subd. (a), 664, subd. (a)) and (2) shooting at an occupied motor vehicle (§ 246). For both counts, the complaint further alleged: (1) personal and intentional discharge of a firearm, causing great bodily injury (§§ 12022.7, subd. (a), 12022.53, subd. (d)); (2) personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and (3) personal use of a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b) and (g)).

The case went to trial in January 2013 and the jury deliberated for approximately 15 hours over four days. The jury found Arbuckle guilty on count 2 and found all the allegations associated with that count to be true. The jury was unable to reach a verdict on count 1 and the court declared a mistrial on that count. Count 1 was later dismissed on the motion of the district attorney.

On May 24, 2013, the court imposed a sentence of 32 years to life in prison—7 years for the violation of section 246, plus 25 years to life for the section 12022.53, subdivision (d), enhancement. Sentences for the section 12022.53, subdivisions (b) and (c), enhancements were stayed.

Arbuckle timely filed a notice of appeal on May 24, 2013.

**II.** *Factual Background*

**A.** *The Prosecution Case*

Brown and Arbuckle became acquainted in 2006 when they lived in the same apartment complex. At the time, Brown was living with the father of her daughter. Arbuckle was in his 40's, a few years older than Brown.

In 2009, Brown's relationship with her daughter's father ended. Arbuckle let Brown and her daughter stay in his one bedroom apartment. Arbuckle, who was blind in one eye, suffered from diabetes, and had high blood pressure, hired Brown as his home healthcare worker.

In July 2010, Arbuckle, Brown, and Brown's daughter moved to a two-bedroom apartment in San Leandro. A few months after moving, Arbuckle's and Brown's relationship became sexually intimate. Brown testified that after the relationship became intimate, Arbuckle was argumentative. He questioned Brown about her "whereabouts, and when [she] was coming, when [she] was going, things like that." The arguments never became physical.

In the fall of 2010, Brown reconnected with an old friend, Christine Cartwright, after being out of contact for eight or nine years, and they began spending time together. Brown believed that Arbuckle had an issue with Cartwright, but didn't know why. Brown eventually began to look for a new place to live.

Late in 2010, Arbuckle authorized his SSI disability benefit to be deposited on Brown's prepaid Visa card, on which she received child support payments.

On December 26, 2010, Brown became ill at a tailgate party at the Oakland Coliseum. Brown and Cartwright spoke by phone and Cartwright came to the Coliseum with her two daughters to help Brown get home. After Cartwright arrived, Brown drove her car, with Arbuckle as a passenger, back to the apartment and Cartwright followed in her own car.

When they arrived at the apartment building, Cartwright prepared to follow Brown and Arbuckle to their apartment, but Arbuckle told her, "Oh, you're not welcome. She's not welcome to come in here." Cartwright and her daughters waited outside while Brown

3

and Arbuckle argued.  Brown wanted Cartwright to come inside the apartment, but Arbuckle told her, "if you don't like it, you can get . . . out too."  The altercation did not become physical.

Brown decided to leave and made five or six trips down the stairs to take her belongings to her car.  Arbuckle asked for the debit card onto which his SSI benefit was deposited.  Brown refused and told Arbuckle that it was her card and her own funds were also deposited onto the card.

Brown finished loading her car and Arbuckle said, from the balcony, "Be right here when I get back and watch what happens."  Brown, Cartwright and Cartwright's daughters got into Brown's car.  Arbuckle asked for his handicap placard and Brown threw it out of the window.  As Brown pulled her car out, Arbuckle picked up the placard.

Brown parked her car at the end of the driveway, at the edge of the street, to make a phone call.  Cartwright observed Arbuckle pacing and mumbling on his balcony.  Cartwright then lost sight of Arbuckle, but about a minute later she saw him walking down the driveway.  Arbuckle walked up to Brown's side of the car, while Brown was still using her phone.

Cartwright heard Arbuckle ask Brown, "Angie, what did you say?"  Brown moved her phone from one hand to the other and turned away from Arbuckle.  Brown heard Arbuckle say, "Bitch, what."  Cartwright saw Arbuckle lift his shirt and she saw a gun in his pants.  Arbuckle took out the gun and the gun fired.  The bullet went through Brown's left hand, struck her neck, and lodged in her shoulder.  Brown slumped down and played dead.

Immediately after the shooting, Cartwright and her two daughters got out of the car, ran, and called 911.  Arbuckle said nothing and did not look around.  He reached in, lifted and let fall Brown's head, and then walked up the driveway toward the building.  At the apartment building, Arbuckle encountered Arthur Hall.  Arbuckle told Hall, "I

4

think I killed the bitch." Hall replied, "Stop bullshitting." Arbuckle responded, "No, I think I killed the bitch."**[2]**

Arbuckle entered his apartment as police officers arrived. He came out onto the balcony and officers directed him to come down the stairs. Arbuckle complied and was taken into custody. The police performed a protective sweep of the apartment and found a Smith and Wesson .357 revolver in plain view on the bed. The revolver had six shells—five live and one expended. The hammer was cocked back.

Brown testified that she had "severe nerve damage" in the hand that was shot, causing continuing pain. She had lost one knuckle and a bone had shattered. The bullet had not been removed. She was still in physical therapy.

## B. *The Defense Case*

According to Arbuckle, he went up to the apartment and retrieved his revolver after he picked up his handicap placard. He had obtained the unregistered firearm several years before, but had never used it. He went to Brown's car, intending "to scare her to see can I get my card back that my money was on." When he went to Brown's car, the hammer of the firearm was not cocked back. Firing the gun required pulling the trigger for the hammer to go back and then forward.

According to Arbuckle, Brown was the only person in the car. Cartwright and her daughters were standing near the car. When he got to Brown's window, he said, "Can I please have my card." Brown replied, "Get the fuck out of here. I told you I'm going to spend this money and everything." Arbuckle raised the gun to point it at her and scare her, but he "accidentally pulled the trigger" when "it hit the mirror and my hand and the trigger went off."

Arbuckle asked Cartwright to call 911. He raised Brown's head and asked, "Are you okay, baby? Are you okay?" Cartwright said, "Please, Angie, play dead." He

---

**[2]** Hall had "hearing challenges" and had hearing aids for both ears, but he was not wearing them that day. Nevertheless, Hall testified that he was able to hear Arbuckle because there were no distracting background noises. Hall said that Arbuckle was "yelling enough—when people drink they talk loud."

propped Brown up in the car seat, but she did not respond.  Arbuckle then walked back to his apartment.

Before entering his apartment, Arbuckle encountered Hall.  He told Hall that he had accidentally shot Brown and asked him to call 911.  In his apartment, Arbuckle cocked the gun and put it to his head, considering whether to kill himself.  He put the gun down and left it on the bed when he heard police sirens.

## DISCUSSION

### I. *Alleged Instructional Errors*

Arbuckle contends that the jury's consideration of his case was prejudiced because the trial court erred by failing to instruct the jury on:  (1) a lesser included offense; (2) accident; and (3) proximate causation.  We find no prejudicial error.

### A. *Legal Standard*

"Even without a request, a trial court is obliged to instruct on ' "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." ' " (*People v. Delgado* (2013) 56 Cal.4th 480, 488.)  This duty extends to " 'instructions on the defendant's theory of the case, including instructions "as to defenses ' "that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)

The trial court also has a duty to instruct on a lesser included offense " ' "if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." ' " (*People v. Wilson* (1992) 3 Cal.4th 926, 941, quoting *Beck v. Alabama* (1980) 447 U.S. 625, 635.)[3]  "For the duty to instruct on a lesser

---

[3]  One might believe that instruction on a lesser included offense would be prejudicial to a defendant.  The Supreme Court explained why it is not in *Keeble v. United States* (1973) 412 U.S. 205, 212-213:  "Moreover, it is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction.  True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense

6

included offense to arise, there must be ' "substantial evidence" [citations], " 'which, if accepted . . ., would absolve [the] defendant from guilt of the greater offense' [citation] but not the lesser." ' [Citation.]" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

" ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

**B.** *Instruction on a Lesser Included Offense*

Arbuckle was charged with violating section 246, which makes it unlawful to "maliciously and willfully discharge a firearm" at an occupied motor vehicle (among other prohibited targets, such as an inhabited dwelling or building). Section 246.3 makes it unlawful to willfully discharge a firearm "in a grossly negligent manner which could result in injury or death." Section 246.3 is a lesser included offense of section 246. (*People v. Ramirez* (2009) 45 Cal.4th 980, 990 (*Ramirez*).)

The jury was instructed that "[s]hooting at a particular object is not limited to shooting directly at that object. It also includes shooting in such close proximity to the target that a probable consequence of the shooting is that one or more bullets either will strike the target or persons in or around it and the shooter acted with conscious disregard for this probable consequence." (See CALJIC No. 9.03.)

The *Ramirez* court analyzed the distinction between sections 246 and 246.3: "Both offenses require that the defendant willfully fire a gun. Although the mens rea requirements are somewhat differently described, both are general intent crimes. The high probability of human death or personal injury in section 246 is similar to, although

---

instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction . . . precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction."

greater than, the formulation of likelihood in section 246.3(a), which requires that injury or death 'could result.' The only other difference between the two, and the basis for the more serious treatment of a section 246 offense, is that the greater offense requires that an inhabited dwelling or other specified object be within the defendant's firing range." (*Ramirez*, *supra*, 45 Cal.4th at p. 990.)

A jury could reasonably find that Arbuckle was guilty of violating section 246.3, but not section 246, only by concluding that the vehicle occupied by Brown was not within Arbuckle's firing range.[4] No evidence would support such a conclusion. Cartwright testified that when he fired, Arbuckle was "right at the door" of the car and could have touched the door from where he stood. Arbuckle admitted that he raised the gun to point it at Brown "to scare her."

We note that the bill enacting section 246.3 "was introduced in response to the phenomenon of celebratory gunfire," which had been the cause of " ' "innocent persons injured and killed by errant bullets." ' " (*Ramirez*, *supra*, 45 Cal.4th at p. 987.) Had Arbuckle fired into the air to scare Brown, whether or not the falling bullet subsequently hit Brown's car or injured Brown, then Arbuckle would have been guilty of violating section 246.3, but not section 246. No evidence presented at trial suggests this scenario or any equivalent scenario. Without such evidence, no jury could rationally conclude that Arbuckle was guilty of violating section 246.3, but not of violating section 246.

Arbuckle quotes the commentary to CALCRIM No. 965: "Grossly negligent discharge of a firearm pursuant to Penal Code section 246.3(a) is a lesser included offense of discharging a firearm at an occupied [vehicle]." He then contends that "there was sufficient evidence that [he] discharged the gun by accident or recklessly or with gross negligence, not intentionally." However, both sections 246 and 246.3 require that

---

[4] The *Ramirez* court noted two differences between sections 246 and 246.3: the higher probability of death or injury inherent in section 246, and whether the inhabited dwelling or other specified object was within the defendant's firing range. However, the higher probability of death or injury inherent in section 246 is because a person is present in the prohibited target. Thus, the first difference that the *Ramirez* court noted is inherent in the second difference, which is the essential difference between the two sections.

the gun be fired "willfully," so a defense of accident does not require instruction on the lesser included offense. The jury was instructed that "[t]he word 'willful' when applied to the intent with which an act is done or omitted means with a purpose or willingness to commit the act or to make the omission in question. It does not require any intent to violate the law or to injure another or to acquire an advantage." The jury necessarily rejected Arbuckle's claim that he fired by accident when it found that he fired the gun willfully. The recklessness or gross negligence that might require a conviction of section 246.3 rather than of section 246 relates to the direction of the willful firing, and not to the willful firing of the firearm itself. Arbuckle again runs against the fact that no evidence suggests that he pointed his gun at anyone or anything other than Brown, sitting in her car.

Arbuckle counters this conclusion by citing *People v. Overman* (2005) 126 Cal.App.4th 1344 (*Overman*), and *People v. Clem* (2000) 78 Cal.App.4th 346 (*Clem*). Neither case is helpful to Arbuckle.

In *Overman*, substantial evidence showed that "moments before defendant fired his rifle, he pointed it at Larry and Bowers, both of whom were standing in close proximity to an occupied building." (*Overman*, *supra*, 126 Cal.App.4th at p. 1362.) This evidence supported the section 246 instruction. "But there was also evidence that defendant violated section 246.3 and not section 246. At trial, Larry testified that he did not see where defendant was pointing his rifle *at the time* he fired it, and no other witnesses saw where defendant was pointing his rifle at the time he fired it. Additionally no bullet holes or points of impact were found on any buildings or objects on [the] property. There was also testimony that defendant was an excellent marksman, . . . [suggesting] that defendant would have hit anything he was aiming at. Accordingly, the jury had reason to infer that defendant fired his rifle *away* from the general vicinity or range of the occupied office building." (*Id.* at pp. 1362-1363.) Here, in contrast, there was no evidence that Arbuckle was pointing his firearm anywhere but directly at Brown.

*Clem* is even less relevant to Arbuckle's case than *Overman*. In *Clem* the defendant was convicted of a violation of section 246.3 after he fired a rifle out the

9

window of his apartment, striking and killing a man in the street below. (*Clem*, *supra*, 78 Cal.App.4th at p. 348.) The defendant, who was also convicted of second degree felony murder, based on the violation of section 246.3, claimed that he only intended to frighten the victim when he fired the fatal shot. (*Ibid.*) The *Clem* court concluded that the felony murder instruction was proper and affirmed. (*Id.* at pp. 353-354.) There is no suggestion in the brief rendition of facts in *Clem* that the defendant might have fired at one of the objects prohibited by section 246 and the issues on appeal did not relate to instruction on a lesser included charge.[5]

The trial court did not err when it omitted instruction on section 246.3 as a lesser included offense.

## C. *Instruction on Accident*

Arbuckle contends that the trial court erred because it did not instruct the jury on accident as a general defense to a criminal charge.

Section 26 specifies that when a person has committed a criminal act or omission "through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence," the person has not committed a crime.

CALJIC No. 4.45 provides: "When a person commits an act or makes an omission through misfortune or by accident under circumstances that show [no] [neither] [criminal intent [n]or purpose,] [nor] [[criminal] negligence,] [he] [she] does not thereby

_____

[5] At oral argument, as well as in his briefing, Arbuckle relied on *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*). In *Thomas*, the court concluded that "the failure to instruct on provocation [or heat of passion as it bears on the culpability for homicide] where warranted [by the evidence] is an error of federal constitutional dimension that denies the defendant due process because it relieves the prosecution of the burden to prove malice beyond a reasonable doubt." (*Id.* at p. 642.) At oral argument, Arbuckle also relied on *Millbrook*, in which, like *Thomas*, a failure to instruct on heat of passion and the constitutional implications of that failure were before the court. (*Millbrook*, *supra*, 222 Cal.App.4th at pp. 1137-1146.) Here, unlike *Thomas* and *Millbrook*, instruction on the lesser included offense was not warranted by the evidence, so the question of whether Arbuckle's federal constitutional rights were violated does not arise.

10

commit a crime."[6]  Similarly, CALCRIM No. 3404 provides, in relevant part:  "[The defendant is not guilty of _____ <insert crime[s]> if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally.  You may not find the defendant guilty of _____ <insert crime[s]> unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent.]"

Arbuckle's counsel did not request an instruction on accident and a trial court has no sua sponte duty to instruct on accident.  (*People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*).)  The *Anderson* court pointed out that " ' "when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties.  While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request." ' "  (*Id*. at pp. 996-997.)  Because a defense of accident is raised to rebut the element of mental state, an instruction on accident is a pinpoint instruction and a trial court has no obligation to give it sua sponte.  (*Id.* at p. 998.)

Anticipating a conclusion, based on *Anderson*, that he has waived the issue by failing to request an instruction on accident in the trial court, Arbuckle also contends that defense counsel's failure to request the instruction deprived him of effective assistance of counsel.  "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components.  First, the defendant must show

---

[6]  The use notes for CALJIC No. 4.45 state:  "If this instruction in its entirety is given, an instruction defining 'criminal negligence' must be given sua sponte."  Arbuckle contends that in accordance with this use note, the court had a sua sponte duty to instruct on criminal negligence as well.  (See CALJIC No. 3.36.)  However, that sua sponte duty arises only if the instruction is given in its entirety and the use notes also state "If the crime charged can only be committed with general or specific intent, do not instruct on criminal negligence."  Section 246 is a general intent crime (*Ramirez*, *supra*, 45 Cal.4th at p. 990), so no instruction on criminal negligence was warranted.

11

that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

Whether we examine the failure to give an instruction on accident on its merits or under the rubric of ineffective assistance of counsel, Arbuckle must demonstrate that he was prejudiced by the lack of such an instruction. We conclude that the failure to give an accident instruction was harmless under any standard of review.

With regard to section 246, the court instructed the jury: "Every person who willfully and maliciously discharges a firearm at an inhabited vehicle is guilty of a crime. The word 'willful' when applied to the intent with which an act is done or omitted means with a purpose or willingness to commit the act or to make the omission in question. It does not require any intent to violate the law or to injure another or to acquire an advantage. [¶] The word 'maliciously' means a wish to vex, annoy or injure another person or an intent to do a wrongful act."

We must assume that the jury was comprised of intelligent persons capable of understanding the instructions given them. Arbuckle fails to explain how, if the jury believed that he fired the gun by accident, it could nonetheless have determined that he pulled the trigger willfully—i.e., that he fired the gun with a purpose or willingness to commit that act. "Accident" is not a technical word and its commonly understood meaning is directly contrary to the "purpose or willingness to commit the act" necessary for the jury to conclude that Arbuckle fired the gun willfully. Similarly, the jury's finding of malice also negates a defense of accident. We have no reason to believe that the jury required an instruction on accident in order for them to acquit Arbuckle of the section 246 charge if they credited his account. (See *People v. Jones* (1991) 234 Cal.App.3d 1303, 1315-1316 [finding lack of an instruction on accident harmless beyond a reasonable doubt because "it is clear, beyond credible argument, that the jury

12

necessarily rejected the evidence adduced at trial that would have supported a finding to the effect that defendant's 'accident and misfortune' defense (meant to establish that the discharge of the shotgun had not been attended by any criminal intent or purpose) was valid, thus implicitly resolving the question of that defense adversely to defendant"], disapproved on other grounds by *Anderson*, *supra*, 51 Cal.4th at p. 998, fn. 3.) Accordingly, the failure to provide an instruction on accident was harmless to Arbuckle under any standard of review.

## D. *Proximate Causation*

Associated with the section 246 count, the information alleged a section 12022.53, subdivision (d) enhancement: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

The court instructed the jury, in accord with CALJIC No. 17.19.5, in relevant part: "It is alleged in Count One and Two that the defendant . . . intentionally and personally discharged a firearm and caused great bodily injury to a person during the commission of the crimes charged."

Arbuckle alleges error as follows: "Section 12022.53, subdivision (d), includes an element **missing** from the jury instruction read in this case. While the trial judge told the jurors that Arbuckle was guilty of that enhancement only if he caused great bodily injury, the judge did <u>not</u> inform the jury it must find his acts 'proximately' caused great bodily injury. Subdivision (d) does not authorize a life sentence if the defendant was a cause of that injury, but only if the defendant 'proximately' caused that injury. Arbuckle contends the failure to instruct the jury on that element of subdivision (d) violated Arbuckle's right to trial by jury and due process under the United States Constitution." (Bolding and underlining in original.)

13

We first note that CALJIC No. 17.19.5 provides for an explanation of proximate causation: "It is alleged [in Count[s] _____] that the defendant[s] _____ intentionally and personally discharged a firearm [and [proximately] caused [great bodily injury] [or] [death] to a person] [other than an accomplice] during the commission of the crime[s] charged. [¶] . . . [¶] [A [proximate] cause of [great bodily injury] [or] [death] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [great bodily injury] [or] [death] and without which the [great bodily injury] [or] [death] would not have occurred.]" However, the use note for the instruction explains: " 'Proximate' appears in the statute but has . . . been disfavored for jury instructions. It is suggested that it be deleted. If there is more than one cause of the bodily injury or death, CALJIC 3.41 should also be given."

In *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), a section 12022.53, subdivision (d), enhancement was at issue. (*Id.* at pp. 333-334.) The trial court instructed the jury that it must find that the defendant proximately caused a great bodily injury or death, but did not define the term "proximately caused." (*Id.* at p. 334.) The *Bland* court held that the trial court had a duty to define proximate causation once it had used the term because trial courts have the duty to clarify terms " 'when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance.' " (*Ibid.*) The court noted that "[e]ven courts and the legal community have struggled with the meaning of proximate causation." (*Ibid.*) Nevertheless, the court held that the error was harmless under any standard. (*Id.* at p. 338.) The court explained that without definition, jurors hearing the term "proximate cause" may " 'improperly *limit* their discussion of what constitutes a cause in fact.' [Citation.] However, jurors who improperly *limit* their discussion of what constitutes proximate cause will not find causation where it does not exist. The correct definition of proximate causation is *broader*, not narrower, than jurors might assume. . . . On the facts of this case, the jury could not have misunderstood the term 'proximate cause' in a way that would have prejudiced defendant, i.e., that would have resulted in a finding of proximate causation on an improper basis." (*Ibid.*)

14

Arbuckle cites *Bland* for the proposition that the trial court had a sua sponte duty to define "proximate cause" for the jury. He reads too much into *Bland*. The duty to define proximate causation derived from the court's prior use of the term. If the instructions do not employ terms of proximate causation, *Bland* implies no duty to define the concept. However, this does not resolve Arbuckle's primary contention that the court was *required* to employ terms of proximate causation in its instruction, in conformance with the statutory terms of section 12022.53, subdivision (d).

Arbuckle cites *Apprendi v. New Jersey* (2000) 530 U.S. 466 and its progeny for the proposition that "[t]he trial court below violated Arbuckle's right to trial by jury. The trial court deleted the element of proximate cause from the jury's consideration, and thereby conclusively established that element against Arbuckle. As the missing element resulted in a sentence many times the underlying offense, *Apprendi* and its progeny govern here and mandate a new trial on the violation of section 12022.53." We disagree.

Causation was not at issue in this case. The evidence raised no issue of unforeseen superseding cause. Arbuckle's claim of accident related to his intent, but raised no issue of causation. As noted in *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1153, "[a] proximate cause requirement would seem to be necessary in only two scenarios: first . . . where there is more than one shooter; and second . . . where the bullet itself does not hit the victim, but the discharge of the firearm is nonetheless the proximate cause of the injury." This case falls into neither scenario.

Because the evidence did not present a scenario requiring consideration of proximate causation, the instruction given here did not remove an element from the jury's consideration. Instead, the instruction replaced the statutory requirement of proximate causation with a requirement of causation in its ordinary sense. As noted in *Bland*, the concept of proximate causation is broader than what jurors will commonly understand causation (or undefined proximate causation) to mean. The result of replacing proximate causation with ordinary causation could only *increase* the burden on the prosecution, if it had any effect at all, and could not have conceivably prejudiced Arbuckle.

15

Where, as here, the evidence does not encompass a scenario requiring a consideration of proximate causation, it is not error for a trial court to instruct on section 12022.53, subdivision (d), using the language of ordinary causation rather than of proximate causation.

## II. *Equal Protection*

Arbuckle contends that his sentence of 25 years to life, pursuant to section 12022.53, violates his constitutional right to equal protection under the law because a person committing a similar crime that did not involve a vehicle would have been subject to a much less severe sentence. As a hypothetical similar crime he proposes the following scenario: "Assume that rather than sitting in her car, Brown—or anyone for that matter—was sitting on the curb or sitting on a bench next to a street or park. A suspect (denominated Perry) walked to the seated victim (denominated Smith) and fired a handgun a single time, causing the same injuries to Smith as those suffered by Brown in this case. Assume Perry was convicted of violating section 245, subdivision (a)(2), felony assault with a firearm, the companion section to section 246, and enhancements for using a firearm gun [*sic*] and causing great bodily injury (violations of section 12022.5 and 12022.7 respectively)." Under such a scenario, "if a court imposed the maximum prison sentence on Perry, imposing every enhancement consecutively, the maximum sentence for Perry would be 17 years—far less than the 32 years to life imposed on Arbuckle."

To succeed on his claim under the equal protection clause, Arbuckle "first must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 568.) "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

## A. *Arbuckle has Failed to Identify Two Similarly Situated Groups*

As Arbuckle makes clear in his reply brief, the two groups that he argues are treated in an unequal manner are (1) those who commit assault with a firearm, causing

great bodily injury, but not involving a vehicle (or other target prohibited by section 246) and (2) those who commit assault with a firearm, causing great bodily injury, but in which a vehicle is within the firing range. Those in the first group would be guilty of violating section 245 and would be subject to the firearm enhancements that Arbuckle proposes in his hypothetical, but not to a section 12022.53, subdivision (d), enhancement. Those in the second group would be subject to the section 12022.53, subdivision (d), enhancement and would, assuming the enhancement were alleged and found true, be subject to a mandatory 25-years-to-life consecutive sentence, exceeding the maximum punishment that those in the first group could receive. We agree with Arbuckle that section 12022.53, subdivision (d), treats the two groups of felons that he proposes in an unequal manner, but we reject his contention that they are similarly situated.

In *People v. Vallejo* (2013) 214 Cal.App.4th 1033, the defendant raised an equal protection argument, arguing that the offense of maliciously discharging a firearm from a vehicle is subject to a section 12022.53, subdivision (d), enhancement, but that attempted voluntary manslaughter, involving the discharge of a firearm after leaving a vehicle, is not. (*Id.* at p. 1044.) The court rejected the contention that those who commit these similar crimes are similarly situated. (*Ibid*. ["such defendants are not similarly situated to appellant, who discharged a firearm while inside his truck"].) Similarly, here, by including section 246 and excluding section 245 gun assaults, the Legislature punished more severely shooters who intentionally shoot at inhabited vehicles or structures. Shooting at an occupied vehicle may involve as many victims as there are occupants. (See *People v. Masters* (1987) 195 Cal.App.3d 1124, 1130.) That offense entails a high risk of great bodily injury or death, as we discuss more fully below. Arbuckle's proposed groups are not similarly situated with respect to section 12022.53, subdivision (d). We reject his assertion that members of his two groups have committed "functionally identical crimes."

17

**B.** *There is a Rational Basis for Treating the Two Groups Unequally*

Even if we had determined that Arbuckle's two proposed groups were similarly situated with respect to section 12022.53, subdivision (d), there is a rational basis for their disparate treatment.

"In resolving equal protection issues, the United States Supreme Court has used three levels of analysis. Distinctions in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest. Classifications based on gender are subject to an intermediate level of review. But most legislation is tested only to determine if the challenged classification bears a rational relationship to a legitimate state purpose." (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200.)

Arbuckle maintains that we must apply strict scrutiny, relying on *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*). "The court in *Olivas* considered an equal protection challenge to a statute that granted a trial court discretion to commit a defendant who was convicted in an adult criminal prosecution, and was between 16 and 21 years of age, to the California Youth Authority for a term longer than he or she would have received had the defendant been sentenced as an adult. Concluding that 'personal liberty' constitutes a fundamental right that triggers application of the strict scrutiny standard, *Olivas* stated: 'No reason has been suggested, nor can we conceive of any, why the concern for personal liberty implicit in both the California and federal Constitutions is any less compelling in defendant's case. We believe that those charters are no less vigilant in protecting against continuing deprivations of liberty than are their due process clauses in protecting against the initial deprivation of that liberty. We conclude that personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions.' ([*Olivas* at pp. 250-251 . . . .])" (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837 (*Wilkinson*).)

However, the *Wilkinson* court, finding that the rational basis standard applied in the equal protection claim before it, commented: "The language in *Olivas* could be interpreted to require application of the strict scrutiny standard whenever one challenges

18

upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals. Nevertheless, *Olivas* properly has not been read so broadly. As the court observed in *People v. Davis* (1979) 92 Cal.App.3d 250[, 258 (*Davis*)]: 'It appears . . . that the *Olivas* court did not want to increase substantially the degree of judicial supervision of the Legislature's criminal justice policies. Such a highly intrusive judicial reexamination of legislative classifications is not merited by a close reading of *Olivas*. There is language in the *Olivas* opinion that emphasizes the narrowness of the holding. For instance, the court noted that [the statute in question] was constitutionally infirm because persons committed under the statute had been "prosecuted *as adults*, adjudged by the same standards which apply to *any competent adult*, and convicted *as adults in adult courts*." [Citation.] This language requires only that the boundaries between the adult and juvenile criminal justice systems be rigorously maintained. We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state interest therefor." [Citation.] Other courts similarly have concluded that a broad reading of *Olivas*, as advocated by defendant here, would 'intrude[] too heavily on the police power and the Legislature's prerogative to set criminal justice policy.' [Citations.]" (*Wilkinson*, *supra*, 33 Cal.4th at pp. 837-838.)

The *Wilkinson* court was considering an equal protection challenge to two statutes under which a defendant could be charged and punished for battery on a custodial officer. (*Wilkinson*, *supra*, 33 Cal.4th at pp. 830-832.) Wilkinson was prosecuted under one provision that rendered her crime a felony, but if the prosecutor had charged her under another statute, her offense could have been treated as a misdemeanor. (*Ibid*.) Wilkinson claimed that she was denied equal protection because of the disparate punishment under the two statutes. (*Id*. at p. 832.) Arbuckle contends: "[*Wilkinson*] did not repudiate *Olivas*. Rather, in the face of a very minimal—and maybe no—difference in punishment specified in two penal statutes outlawing similar conduct, the Court found that the

19

judicial branch had very little role in evaluating which crimes the executive branch charged in a particular case."

We acknowledge that Arbuckle's equal protection argument is distinguishable from the argument presented in *Wilkinson*, but Arbuckle reads *Wilkinson*'s commentary on *Olivas* far too narrowly. The Supreme Court stated that "*Olivas properly* has not been read so broadly" as to require strict scrutiny whenever statutes authorize different sentences for comparable crimes. (*Wilkinson*, *supra*, 33 Cal.4th at p. 837, italics added.) The Supreme Court also approvingly quoted language from *Davis* to the effect that *Olivas* should be read narrowly to apply only to the boundaries between the adult and juvenile criminal justice systems. (*Ibid*.) We agree with *People v. Ward* (2008) 167 Cal.App.4th 252, 258 (*Ward*), that *Wilkinson* stands for the proposition that "the rational basis test applies to equal protection challenges based on sentencing disparities."[7]

Because we apply the rational basis test and not strict scrutiny, the question before us is whether, assuming Arbuckle's two hypothetical groups to be similarly situated, there is a rational basis for the Legislature to specify more severe punishment for an assault by firearm, resulting in great bodily injury, when a vehicle is within the defendant's firing range than when a vehicle is not. A rational reason for more severe punishment is easily found in the increased danger to the public attendant to discharging a firearm at a vehicle. If the driver of the vehicle is wounded, the driver may lose control of the vehicle, posing a danger to other vehicles, their drivers and passengers, and pedestrians. Even if unwounded, a panicked driver may pose similar danger. Even if the vehicle is parked with the ignition off, a wounded or panicked driver may start the vehicle in an effort to escape, again posing a danger to others. None of these vehicular

---

[7] *Ward* also notes that "[t]he Supreme Court has recognized the strong presumption that legislative enactments must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears." (*Ward*, *supra*, 167 Cal.App.4th at p. 259, citing *People v. Morgan* (2007) 42 Cal.4th 593, 605.)

20

dangers is present in Arbuckle's hypothetical of an assault by firearm on a person sitting on a curb or a park bench. Accordingly, Arbuckle's equal protection argument fails.[8]

## DISPOSITION

The judgment is affirmed.

---

[8] Our conclusion follows numerous cases rejecting equal protection challenges to section 12022.53. (See *People v. Perez* (2001) 86 Cal.App.4th 675, 678-679 [rejecting equal protection challenge because of "disparate punishment of the same offenders whose only difference is their deadly weapon of choice"]; *People v. Hernandez* (2005) 134 Cal.App.4th 474, 481 [rejecting equal protection challenge because of different treatment of aiders and abettors of firearm users depending on whether the murder involved was for the benefit of a criminal street gang]; *People v. Taylor* (2001) 93 Cal.App.4th 318, 322 [rejecting equal protection challenge because section 12022.53 applied to an attempted robbery, but not to other crimes such as assault with a firearm]; *People v. Alvarez* (2001) 88 Cal.App.4th 1110, 1114-1115 [rejecting equal protection challenge because similarly situated murderers using other kinds of deadly weapons are not subject to the firearm enhancement].

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.